143 So.2d 722 (1962)
Joy L. BENNER, Appellant,
v.
Elizabeth K. PEDERSEN, Appellee.
No. 2957.
District Court of Appeal of Florida. Second District.
August 17, 1962.
Rehearing Denied September 5, 1962.
*723 Robert G. Murrell of Sam E. Murrell & Sons, Orlando, for appellant.
Bernard C. Muszynski, Orlando, for appellee.
WHITE, Judge.
Appellant Joy L. Benner was one of two defendants in an interpleader suit by Prudential Life Insurance Company to determine the beneficiary of two policies on the life of Arthur J. Pedersen, deceased. The appellant was the last named beneficiary endorsed on the policies in question. The beneficiary previously named therein was Elizabeth K. Pedersen, the insured's surviving wife who was the other defendant in the interpleader proceedings. The policies permitted change of beneficiary by the insured.
The Prudential Company paid the insurance proceeds into the registry of the court, and the court on final hearing ruled in favor of Elizabeth Pedersen and against Joy Benner. The decree in effect sustained the contention of Elizabeth Pedersen that the change of beneficiary was invalid and ineffectual because of an unrebutted presumption of undue influence exerted upon Arthur Pedersen by Joy Benner. Joy Benner urges on appeal that the decree is contrary to the evidence and the law.
Arthur Pedersen was a forty-three year old major in the United States Air Force who died of cancer at an Air Force hospital in Texas on March 24, 1960. He first met Joy Benner in 1959 shortly before or after she became a member of the Florida Wing of the Civil Air Patrol with which Major Pedersen was connected as a liaison officer. Major Pedersen became enamored of Joy Benner, who was considerably younger than he, and there ensued a close association between them. Elizabeth Pedersen filed for divorce in September, 1959 and the suit was pending against Major Pedersen at the time of his death.
The change of beneficiary from Major Pedersen's wife to Joy Benner took place on December 28, 1959. Less than three months thereafter he attempted to change the beneficiary under both policies back to his wife. This was at the hospital in Texas on March 22, 1960, two days prior to his death. The request was by mail to the Prudential Company but could not be carried out because the policies were not enclosed. The policies thus lacked the formal endorsements *724 contemplated by the terms of the policies. A search among Major Pedersen's effects after his death did not disclose the folders that usually contained his policies; but Joy L. Benner thereafter presented the policies to the Company, together with proof of death and her claim to the insurance proceeds.
The trial court determined, as stated, that Elizabeth Pedersen was the true beneficiary and entitled to the insurance proceeds. The findings in the nine-page memorandum opinion stated that from February 1960 until the insured's death on March 24, 1960 he was in a "comatose" or "stuporous" condition but that at intervals he was alert and knew what he was doing; that the insured, although generally weak on March 22, 1960, was in possession of his faculties and knew what he was doing when he made the request for change of beneficiary back to his wife. Directly on the crucial question of the validity vel non of the designation of Joy Benner as beneficiary, the court's memorandum opinion reads in pertinent part as follows:
"3. The legal relation of employer and employee did not exist between JOY L. BENNER and Major Pedersen, but the evidence shows she performed services as Secretary to him and as Director of Administrative Services of the Civil Air Patrol worked very closely and in the same office with Major Pedersen who was in Command of the Liason [sic] Office of the Civil Air Patrol so that a confidential relationship did exist between them. The evidence clearly shows an illicit romance between them, beginning at least in the early part of 1959 and continuing until he died or near that time. There is no direct evidence of undue influence by JOY L. BENNER on Major Pedersen in effecting the change of beneficiary in her favor on the two policies endorsed by Prudential December 28, 1959, but the evidence sufficiently establishes such a meritricious relationship between them that under the law a presumption of fact arises that there was undue influence. Beatty v. Strickland, [136 Fla. 330], 186 Sou. 542 supports this rule, although it appears to be the minority rule. A prima facie case is thus made out against JOY L. BENNER, thereby requiring that she assume the burden of proving that the change of beneficiary was not superinduced by undue influence. This, she failed to do, and there is no evidence whatever, either denying the facts showing the illicit romance or tending to prove the bona fides of the transaction a consideration therefor or the absence of undue influence. The change of beneficiary to JOY L. BENNER is therefore void, leaving ELIZABETH K. PEDERSEN as the beneficiary under the policies as they existed before the attempted change to JOY L. BENNER." (emphasis added)
The trial court found that a meretricious relationship existed between Major Pedersen and Joy Benner as of December 28, 1959. If this finding is not reversible on appeal we agree that under Florida law as exemplified in Beatty v. Strickland, 1939, 136 Fla. 330, 186 So. 542, the change of beneficiary to Joy Benner was presumptively the result of undue influence. The further decisive question then would be whether or not the evidence adduced on behalf of Joy Benner, or the evidence as a whole, dispelled that presumption. Significant in this connection is the circumstantial similarity of Beatty v. Strickland wherein the court held for the wife and against the last named beneficiary. In drawing the comparison we shall first relate in further detail the facts in the instant case.
There were two policies on Major Pedersen's life, one for $6,000.00 and one for $1,000.00, and Elizabeth Pedersen was beneficiary under each policy until after the advent of Joy Benner. Joy Benner occupied an office adjacent to Major Pedersen. She took dictation and performed clerical services for him and accompanied him alone on *725 flights out of the State of Florida. She used his pink Cadillac automobile while he was in the hospital.
Colonel Joseph F. Moody, Florida Wing Commander of C.A.P., testified that Major Pedersen would go to the office on work nights of C.A.P. although the Air Force working day was over; that Joy Benner on occasion requested him, the witness, to drop her at the Bachelor Officers Quarters so that she could pick up Major Pedersen's car; that when the Major went to Orlando Air Force Hospital, Joy Benner visited him frequently. Colonel Moody stated that he "realized that Major Pedersen had more than just an emotionless relationship with Miss Benner and a working devotion to the C.A.P. office after it had gone on for several months"; that it became more and more obvious that "they would go out to themselves away from where everyone else would be working"; that Major Pedersen had told him that "they" had rented an apartment with a driveway in the back where it couldn't be seen from Colonial Drive. Colonel Moody told Major Pedersen that he was acting like a damn fool.
Air Force Sergeant Wilburn H. Pickle testified that Joy Benner went on flights with the Major alone. Elizabeth Pedersen testified that she had seen the Major and Joy Benner emerging together from the latter's apartment; that Miss Benner drove the Pedersen Cadillac while they were at Lackland Air Force Base in Texas; that on one occasion she, the witness, saw the Cadillac parked all night adjacent to Miss Benner's apartment and she went to the apartment and told Miss Benner: "Tell Major Pedersen to come home where he belongs." Miss Benner stayed at the quarters provided by Lackland Hospital for families of patients. Relating back to Major Pedersen's health during these last months a Dr. Bailey testified that on December 10, 1959 he began treating the Major with narcotics. This was a little over two weeks before the change of beneficiary.
Letters from Major Pedersen to Joy Benner were found after his death in the trunk of his car. They referred to her as "My Darling", "My Sweet", "Sweetheart", "My Kitten", "Honeybunch" and similar terms of endearment. Also found in the Major's car were articles of women's apparel, including shoes and bouffant petticoats, which did not belong to his wife. Such was the import of the testimony. Joy Benner offered no testimony. There was, in fact, no evidence whatsoever by way of rebuttal.
We revert now to Beatty v. Strickland, supra, wherein the insured likewise was an older man who, after years of marriage, became involved with a woman considerably his junior. Divorce proceedings were instituted against Dr. Strickland and were still pending at the time of his death. The insured had become addicted to drugs prior to the time he changed his beneficiary. The court found a legitimate working association and an illicit relationship between them. In this connection the court found and philosophized as follows:
"There is ample evidence to show that Myrtle Beatty occupied a relationship of confidence and trust with Dr. Strickland * * *.
* * * * * *
"The record warrants the conclusion that the relations between Dr. Strickland and Miss Beatty were those not only of a legitimate confidential nature but were also those of lover and mistress.
"Things which are of general knowledge must be presumed to be known to the courts and we may, therefore, take judicial cognizance of the fact that when a married man, past middle age, becomes enamored of a young woman to such extent that he is willing to abandon his family that he may take up and pursue more intimate relations with the woman who, in nearly all such instances, is younger than his *726 wife, and when such younger woman occupies a position of trust and confidence in his business affairs, it becomes almost universally true that the wish of the mistress becomes the law of the lover. That in common parlance she can `twist him about her finger at will' or `make him jump through the loop' or `come and go at her beck and call;' that her mind instead of his controls his conduct and that this is true, although the lover may not be an addict of the drug habit, but if he happens to be a drug addict such condition is quite certain to accentuate his weakness and render the influence of the mistress more potent.
"Doubtless there have been and are some splendid women who unfortunately love not wisely, and too much, but who never take advantage of the insidious influence which they could each wield over the mind and conduct of him who is the object of her affection, who have no desire to wreck a home or to cause discord therein.
"It has been said that `when a man finds himself stealing his wife's potted plants and carrying them off to another woman he is losing his mental equilibrium and it is time for him to stop.' Undoubtedly, one may become so deranged by the influence of illicit love and sexual indulgence as to disregard all moral obligations, all family ties and all respect for social standards. In such conditions, one is subject to the will of the paramour.
"* * * [H]ere we have a case where a young woman whom the evidence indicates had become the mistress of a man more than 45 years of age; the man had become so enamored of the woman as to be willing to give up his family for her; the woman occupied a relation of confidence and trust in his business affairs and was his daily associate. The evidence shows that from the time this relationship began the attitude of the man toward his family changed; that whereas he had been a loving and indulgent husband and father he became careless and negligent toward his family and to a like degree became more attentive and considerate of his confidential helper and mistress; that as a result of the insidious influence of this woman he attempted to so change the beneficiary of an insurance policy that upon his death the proceeds of the policy would enure to his mistress instead of to his wife."
In Beatty v. Strickland, just quoted, it apparently was unnecessary to stress in terms the rule of adverse presumption and risk of non-rebuttal. The opinion, however, is pregnant with recognition of that evidentiary principle, and the court expressly stated that "The rule of law which is applied to the matter of undue influence in the execution of wills applies in cases of this sort." Beatty v. Strickland is essentially in point and dictates the answer to this appeal as it also influenced the trial court's decision.
Whether the law applicable in this class of cases be likened to the law of wills as applied to a purported beneficiary or to the law of gifts as applied to a purported donee appears, after all, largely academic. They involve the same principles and point to the same salutary rule, viz., that where there is a confidential relationship or a quasi confidential relationship through meretricious association between a legally unrelated donee and donor, a presumption of overreaching or undue influence arises which may justify a voidance of the transaction in the absence of positive evidence of good faith and fair dealing. See and compare 15 Fla.Jur., Gifts, §§ 22, 23; 34 Fla.Jur., Wills, § 89 et seq.; Crane v. Stulz, Fla.App. 1961, 136 So.2d 238; In re Palmer's Estate, Fla. 1950, 48 So.2d 732; Wartmann v. Burleson, 1939, 139 Fla. 458, 190 So. 789; Beatty v. Strickland, supra.
*727 We conclude that the record here sufficiently supports the trial court's finding that a meretricious relationship existed between the insured and the defendant Joy Benner, thereby shifting the burden to that defendant to adduce evidence in rebuttal of a presumption of undue influence. As stated before, Joy Benner offered no testimony to refute the opposing evidence and establish the fairness of the particular transaction.
The trial court having correctly evaluated the evidence and applied the controlling law, the decree appealed must remain undisturbed.
Affirmed.
ALLEN, Acting C.J., and KANNER, J., concur.